## In re PITTSBURGH RYS. CO.

### No. 20225.

District Court, W. D. Pennsylvania.

April 5, 1948.

Blaxter, O'Neill & Houston, of Pittsburgh, Pa., for Pittsburgh Rys. Co.

George Zolotar, of New York City, for Securities and Exchange Commission.

John H. Marshall, of Pittsburgh, Pa., for City of Pittsburgh.

McVICAR, District Judge.

The petitions of the Securities and Exchange Commission and the City of Pittsburgh, the answer of W. D. George and Thomas Fitzgerald, Trustees of Pittsburgh Railways Company, debtor, and Pittsburgh Motor Coach Company, subsidiary, the reply of the Securities and Exchange Commission and the preliminary objections of the Trustees, were referred to Watson B. Adair, Esq., Special Master, for hearing and report. The action is now before us on the aforesaid pleadings, the report of the Special Master and the objections thereto

of the Securities and Exchange Commission and the City of Pittsburgh.

The prayers of the Securities and Exchange Commission and the City of Pittsburgh, in their petitions, were substantially the same; that the Trustee be directed to engage, subject to the approval of the Court, at reasonable per diem, and maximum rates of compensation, a competent qualified and independent transit engineer or specialist or firm of transit engineers or specialists to conduct a survey as to the advisability of substituting bus service in whole or in part for the street car service presently being undertaken by the Debtor, and such other and further relief as may be just and proper.

Petition of the Securities and Exchange Commission.

In the petition of the Securities and Exchange Commission, it is averred that an issue basic to any reorganization is the nature and character of the operations to be conducted by the reorganized company. In connection with any judicial determination that a plan is fair and equitable and feasible, the Court must be satisfied that the reorganized company will be operated efficiently and economically and in a manner designed to secure for investors the maximum benefit from earnings which the enterprise, under all the circumstances, is capable of producing.

In this proceeding, one question on which the Court will be required to pass is whether the continuation of service principally by means of street railways is best calculated to produce the aforesaid results.

The scope of the present operations of Pittsburgh Railways Company embraces all of the urban and interurban street railway and a large part of the bus operations in the City of Pittsburgh and adjacent parts of Allegheny, Washington and Westmoreland Counties.

Bus operations have comprised a relatively small proportion of the system's total operations.

The substitution of busses for street railways, in the opinion of transit experts and of the managements of many transit companies, has resulted in improved service to the public, lower operating costs, and increased earning power for the transit companies. The possibility of similar results from the substitution of busses in Pittsburgh is important to security holders and may affect their participation under the plan.

It is considered judgment of the Securities and Exchange Commission that a bus survey as now proposed is important to the proper administration of this proceeding. Such a survey, conducted independently by competent traffic, engineering and transportation experts, free of the management's apparent predilection for street railway operations, should permit the definite determination of the question whether the Debtor's operations should or should not be converted to bus operations, and the manner, extent and time of such conversion in the event that it is found desirable in whole or in part.

Such a survey would provide answers to such problems as the practicability of transporting the existing volume of transit traffic in busses, loading and fare collection methods, routing and scheduling, size, types and characteristics of desired busses and other facilities, capital required, financing, analysis of comparative operating costs, traffic and earnings possibilities, maintenance and depreciation policies, disposition of superseded equipment and necessary qualifications and adaptability of operating officials and personnel.

The cost of such a survey will be relatively small, considering the vital necessity therefor and the possibility of the substantial benefits to be derived by security holders and the public.

A survey is now timely for the following reasons:

(c) At the reorganization plan hearing it will be necessary to consider the question of the future scheme of operations and future earnings. It is therefore necessary as well as appropriate that there be included in the record of plan hearings an impartial study of the probable effect of bus substitution on transit traffic, operating costs, earnings, valuation, future capital requirements, and other pertinent considerations bearing on the fairness and feasibility of the plan.

Special Master's Conclusion and Recommendation.

The Special Master heard the evidence offered, made a very thorough study thereof, and reached the following conclusions and recommendation:

### Conclusion

"It is concluded that the survey proposed is not necessary for the purpose of determining whether a plan or reorganization is fair, equitable and feasible and that in view of all the circumstances the obtaining of the survey at the expense of the estate is inadvisable.

### "Recommendation

"It is recommended that the petitions be denied."

Special Master's Findings of Fact.

The Special Master made a very careful and exhaustive findings of fact, 42 in number. I will quote from these findings of fact some of the findings which are fully sustained by the evidence and which I consider to be material in the discussion which follows:

Findings of Fact:

"3. * * * In the course of the reorganization proceedings the Trustees have added 18 new bus routes and have made extensions to 5 existing routes. * * *"

"8. There is a trend in cities having a population of 100,000 or more, toward the conversion of street railway operations to bus and trolley and bus operations. * *"

"11. In a number of large cities the operators of transit systems have either eliminated or have programs for the ultimate elimination wholly or to some substantial extent of the use of street cars and the substitution of buses or trackless trolleys, or both. * * *"

"12. In some states, e. g., New Hampshire, North Dakota, South Carolina, South Dakota, Utah, Vermont and Wyoming, passenger street cars have disappeared."

"13. The evidence does not show to what extent the conditions in other cities are comparable to those in Pittsburgh."

"14. The financial gains, if any, actually realized from the conversion of street car operations to bus or trolley bus operations was not satisfactorily shown. * * * There are other data showing large increases in revenue passengers following modernization by gas buses or trolley buses in various cities and there are various predictions of expected economies in several cities, for example, Chicago, Seattle and Washington."

"15. In some cities consulting engineers have been employed in making surveys similar to that now asked. This was done in Buffalo, in Chicago, in Cleveland and in Seattle. In Chicago, the United States District Court, in connection with the reorganization under section 77B and in Equity of certain transit companies, employed an advisor who made a report."

"17. There have been studies made touching the matter of mass transportation in Pittsburgh. Robert Moses, an outstanding city planner, gave the Pittsburgh Regional Planning Association an opinion on Pittsburgh's arterial problem. Mr. Moses does not appear to have made a study of the mass transportation problem in Pittsburgh, but in his report he says, among other things, 'The entire street car problem should be the subject of prompt, impartial study. Street cars are obsolete in most large cities throughout the country.' * * * Mr. Donald M. McNeil, Traffic Engineer, Bureau of Traffic Planning, Department of Public Safety of the City of Pittsburgh * * * recommends that an unbiased survey be made as soon as possible. In his opinion, Pittsburgh is not so inherently different from other cities that their experience would be of no value here."

22. The Pennsylvania Public Utility Commission disapproved of the plan of reorganization then before it (1940) and in its order said, among other things:

"The riding public in Pittsburgh and its immediate environs is entitled to a mass transportation system which will give adequate service at reasonable rates. To this end studies should be made looking toward the elimination of duplicate facilities, such as the elimination of either street car service or bus service, and of either street car service or incline-plane service, where both services are now available; to the substi-

tution of trackless-trolley (trolley-bus) service or gas bus service where street car service is now, or probably soon will be, economically unwarranted; and above all, to the elimination from the reorganization of those interurban lines which do not now fully pay their own way and which cannot be counted upon to pay their own way for a long time into the future, if ever."

"Our experience over a number of years has convinced us that the street car is disappearing as a medium of mass transportation, except in the congested parts of a few of our larger cities. We have seen city after city abandon street car service, in whole or in part, in favor of either bus service or trackless-trolley service, or a combination of trackless-trolley and bus service. And we have seen interurban line after interurban line substitute bus service for street car service. In the light of all this, it is strange that the trustees should propose a plan of reorganization which would leave the physical system as it is, except for the elimination of the Mount Oliver Incline Plane, which would be eliminated because the heights served by the incline plane are so adequately served by street car."

"23. The Trustees filed a revised plan of reorganization dated June 2, 1941. In this revised plan, it was said, among other things: 'In an endeavor to comply with the suggestions of the Commission, this plan contemplates (a) the complete exclusion of certain companies and their properties from the reorganized system, and (b) the ultimate abandonment of all or part of the operating street railway facilities of certain other companies which are included in the plan, and the substitution of gas bus service for the abandoned street railway service in so far as that is deemed necessary.' The revised plan also said: 'It is not contemplated that the abandonment of street railway facilities and the substitution of service by gas bus, as above stated, would take place immediately upon consummation of the plan. It will be necessary for the New Company to make application for such abandonments and substitutions to the Pennsylvania Public Utility Commission as required by law, and for the Commission to give its approval before these changes can be put into effect.' "

"25. The Trustees filed amendments, dated December 15, 1941, to the revised plan of reorganization aimed to meet the Commission's objections thereto. These amendments were referred to the Public Utility Commission which made an order January 12, 1942, approving the plan dated June 2, 1941, as amended by the amendments dated December 15, 1941. In this order the Commission said, among other things: 'The revised plan also provides for the ultimate abandonment of parts or all of a number of other street railway routes, and the substitution of bus service on most of them. We concurred in that program, but said that the facilities marked for abandonment, although properly excluded from the capitalization base, nevertheless should be taken into the accounts of the reorganized company, with appropriate offsetting reserves.' "

"26. The revised plan as amended 'proposes the substitution of motor coaches for street cars on the shuttle routes, two routes in outlying districts and on the outer end of one route that operates to the downtown district. The substitution of motor coaches on one of the shuttle routes has already taken place. It is not contemplated that the abandonment of street railway facilities and the substitution of service by motor coach would take place immediately upon consummation of the reorganization plan, but that these routes would be re-studied in the light of conditions then existing, and if found desirable, application made to the Pennsylvania Public Utility Commission to put these changes into effect.' "

"27. * * * The Trustees and their staff collectively reviewed all of the data and statistics concerning the routes of the railway system and on the basis of that data and their general knowledge and experience, selected the portions of the system which should be studied for substitution of gasoline buses or trolley buses."

"40. Mr. Miles C. Kennedy, a member of the firm of Coverdale & Colpitts, consulting engineers, estimates that the cost of a survey such as he understands would be required, if the pending petitions were granted, would be upwards of $600,000.00, and that the making of the survey would require a year to fourteen months, if every-

thing went reasonably well. His firm would not undertake the job at a fixed fee. Mr. Lawrence S. Waterbury, a member of the firm of Parsons, Brinckeroff, Hogan & MacDonald, consulting engineers, estimates that the cost of a survey such as he understands would be required, would be approximately $75,000.00, on the assumption that his firm would specify the amount of work and the type of work that it would do in satisfactorily answering the questions raised in conducting the survey, and estimates that the survey would take from four to six months. On the assumption just described this firm would be willing to take the work for a $75,000.00 fee."

"42. The Allegheny Conference of Community Development a planning research organization, financed and operated by certain representative business interests in the city of Pittsburgh and Allegheny County, is engaged in a study of community problems and is developing a total community improvement program. This Conference has authorized a study of the transportation problem in Pittsburgh, the object of which is to develop recommendations for a practical program of improvements in mass transportation for the peoples in the County, as determined by the needs of the area. * * * The estimates of the cost of the study under the plan which the Conference is operating is approximately $55,000.00 and it is contemplated that this study would take 18 months. * * *"

### Discussion

It seems evident from the facts in this case that a survey should be made, whether the result thereof is used in the present reorganization proceedings, or not. It also appears that such a survey may be of value in the reorganization proceedings.

Changes from street car to bus transportation have been made and are being made generally throughout the United States. Such a study has been recommended for Pittsburgh and the area covered by the Pittsburgh Railways Company system. I am advised that the hearings in this action now being held before the Special Master and which relate to the subordination of the Philadelphia Company claims and the plan of reorganization, will take several months.

if the survey petitioned for shows no substantial change necessary, there would probably be only a little delay, if any. If the survey shows a substantial change and that it should be a part of the reorganization plan, then whatever delay is required would be proper.

In the proceedings now before the Court, the only persons that have appeared in favor of the petitions were the Securities and Exchange Commission and the City of Pittsburgh. The only persons who opposed said petitions were the Trustees of the Debtor and its subsidiary.

At the hearing before the Court, the Securities and Exchange Commission attorney stated that at the hearing of the reorganization plan, it intended to have an expert engineer give evidence on the subject of a change from street cars to busses and that this would probably necessitate the employment then of an expert engineer by the Trustees. The attorney for the City of Pittsburgh stated that he concurred with all that was stated by the Securities and Exchange Commission attorney.

In the making of the order in this case, I am not unmindful of the fact that the reorganization proceedings should be prosecuted with reasonable diligence.